Oyez! Oyez! Oyez! All persons having business before the Honorable United States Court of Appeals for the District of Columbia Circuits are admonished to draw near and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Case No. 19-5212, Association for Community Affiliated Plans et al. v. United States Department of the Treasury et al. Mr. Rothfeld for the appellate. If attorneys would please introduce themselves before they speak. This is Charles Rothfeld for the appellant, Mayor Brown. May it please the Court, this is Charles Rothfeld and please, Your Honors, if you have difficulty hearing me, let me know. It's a novel experience for all of us. We are here to challenge the short-term limited duration rule. That rule goes a long way towards dismantling the Affordable Care Act. The rule assures that the ACA will not operate as Congress intended. It misunderstands and misapplies the language of the statute that it purports to interpret and it is, in addition, arbitrary and capricious in a number of respects. I'll run through those three points in order. Each of them independently require invalidation of the rule. First, the rule is premised on a counterfactual understanding of the language and operation of the ACA. Congress enacted the ACA with particular goals in mind and wanted to accomplish those goals in a particular way. The goals were to assure that the largest possible number of people... Mr. Rothfeld, when Congress enacted the ACA, didn't they adopt the definition of the short-term limited duration rule that we now effectively have now? I think they did not adopt that definition, Your Honor. The definition had been promulgated by a regulation in 1997. At the time the ACA was enacted, incorporating a reference with short-term disability, short-term limited duration, meant under HIPAA, right? Incorporated that by reference. That's correct? Well, it incorporated the exception from the definition of individual health insurance. That term had been given meaning by regulations at that time, right? So when Congress used that phrase, it came with some history and some meaning that had been given by regulation. Is that correct? Is that correct? Yes or no? Is that correct? Yes or no? There had been regulations issued prior to and after the ACA that gave the department's agency's interpretation of that phrase, short-term limited duration, meant. Is that correct? That is correct, Your Honor. Okay. And the meaning that the agencies had in that phrase, is that meaningfully different than the rule you're challenging today? I think it is substantially similar to that interpretation, but I would have reason to say, Your Honor, that I think that the ratification doctrine, which the government relies on very heavily, I think simply has no application in the context here, because this court and the Supreme Court have both said repeatedly that the ratification doctrine rests on the It was familiar with the regulation that it is purporting to have ratification. If Congress was not familiar with the regulation, if there's no reason to believe that Congress... How long had that regulation existed at the time that the ACA was adopted? It had existed for 13 years, Your Honor, so it is... And you're saying Congress was unaware of the meaning that had been given to that term by the agencies? I am saying that, Your Honor, and I'll make sure... So what's your evidence for that? What's your evidence? What should be... I mean, there are all sorts of canons that we presume that Congress knows what the law is, and it's an act where they take this phrase from another statute that had been given meaning by the agencies. It seems to me you have a very heavy burden to show that Congress didn't intend to do what Congress actually did. Well, I guess I would disagree with Congress actually did ratify... No, you just told me what they did. What they did is they used a statutory phrase, they put that in the ACA, and that statutory phrase had been given meaning and interpreted by agencies, I think you said, for years. But that's what they did. They put that in the ACA, and that's exactly why they didn't intend to bring the meaning that the agencies had given his law that established with it. I guess that's the problem I'm having. Let me give you two points in response to that, Your Honor. First, a legal point, and second point regarding this regulation in particular. A legal point is that, as the Supreme Court and this Court have both said, notwithstanding the fact that a regulation has been on the books, and perhaps it's been on the books for quite a long time, absent some clear reason to believe that Congress was aware of that regulation, the ratification doctrine doesn't apply. And I'll just read what the Supreme Court said in the Brown v. Gardner case, which we quote in our briefs, and I'm quoting the Supreme Court. The record of congressional discussion preceding reenactment makes no reference to the VA regulation. There is no other evidence to suggest that Congress was even aware of the VA's interpretive position. In such circumstances, we consider the reenactment to be without significance. So I think that there has to be some indication that Congress, in fact, was aware of the regulation for ratification to apply. Here, the short-term immigration regulation promulgated in 1997 was involving a rule that had received essentially no attention by anybody in Congress or in the broader community. When the regulation was promulgated in 1997, it was of such little significance that the agencies did not explain why they adopted that definition. They said nothing about it. When they adopted the final rule that incorporated the same definition in 2004, they gave no explanation. The regulation received absolutely no comments, zero comments. It was a niche consideration in the health insurance market at the time that had received essentially no attention. When Congress considered the ACA in 2010, the short-term limited duration insurance does not appear in the text of the statute at all. And so far as we've been able to determine, it was not mentioned by anyone at any point during the entire lengthy discussion of the legislative background, legislative history of the ACA. So we think that, in fact, it is sort of inarguable that Congress simply did not have short-term limited duration insurance in mind when it enacted the ACA. And we think it is particularly unlikely that Congress intended, by using a cross-reference to a definitional provision in another statute, which contained an exception for this very obscure niche product, that Congress meant to authorize the agencies as they did in this case to seize upon that as a mechanism for creating an entire new form of primary insurance, a novel form of primary insurance never before used in the market that could be used in competition with ACA-compliant plans that would be designed and expressly was designed to draw millions of people out of those ACA-compliant plans and out of what Congress had established in the ACA as a single risk pool. When Congress enacted the ACA, it had particular goals in mind and it wanted to achieve those Mr. Rothfeld, before we get to the goals, just on ratification, usually ratification, a lot of these ratification cases involve agency interpretations that are informally expressed through practice. You talked about Brown. That was a case in which the agency had been on both sides of the same question. Here we have a regulation with the force and effect of law. As Judge Griffith said, there's a presumption that all of us know what the law is, which would seem to cover regulations as well as statutes. So, I mean, is there any case where a court has declined to ratify based on the ground that Congress just didn't know about the interpretation, where the interpretation was embodied in a binding regulation itself with the force and effect of law? Well, I think that, Your Honor, I think that that ground is in fact such a case. I mean, the Supreme Court specifically referred to the regulation. And I think that, as this court has said, in cases like Public Citizen, that the principle of ratification has to be based on the understanding that, and I'll quote what the court said, the rationale of this canon must be that those in charge of the amendment are familiar with existing rulings or they mean to appropriate them. Government's argument for ratification has little weight, absent some evidence or reason to assume congressional familiarity with the administrative interpretation at issue. And here, for the reason that I suggested... Yes, excuse me. Finish your sentence. I'm sorry, Your Honor. No, finish your sentence. I'm sorry, Your Honor. I'm apologizing for interrupting you. Please finish your sentence. Oh, I appreciate that. I think for the reasons that we have been discussing, I think that the reality is that at the time the ACA was enacted, it was a very, very, very small part of the health insurance market. It was a niche product. And at the time that Congress enacted the ACA, nobody had it in mind. Again, the ACA had a very, very lengthy legislative history and background. There was, so far as I can determine, no discussion of SDLDI insurance at all. All right. Let me ask you then, is your basic argument that necessarily Congress' establishment of the single pool provision means that Congress could not have intended the type of interpretation that is urged upon us in the district court's opinion, which makes no reference to this particular provision of the statute, and I gather from your brief, was not mentioned by the government in the district court, namely the section 18-032 of section C. Yes, Judge Rogers, we think that our conclusion follows necessarily from that provision. That's not the only thing that we rely on. We think that the government's interpretation is inconsistent with a number of elements of the ACA, but it is certainly inconsistent with that one because Congress, the entire theory of the ACA was that all policies issued by insurer should be in a single risk pool. That was a way of avoiding adverse selection. It was a way of making it impossible for employers to cherry-pick young and healthy people who would get lower prices and, as a consequence, segregating into their own much more expensive policies older and sicker people. That's why I focused my question on the statutory provision, since all of your theories, as I understand it, rest on that basic provision that Congress included in the Affordable Care Act, and I understand the other arguments, but Judge Griffith, as I understand it, is pointing out that there is a direct reference here in the Affordable Care Act. So it's not as though the limited insurance provision is something that was on the books but simply unmentioned entirely by Congress. So given that it was, however limited the reference may be, I think to me at any event, a lot of these arguments about it was such an unimportant provision that Congress couldn't have really been serious. I understand those arguments, but I'm trying to understand the argument in terms of the statutory provision that Congress actually enacted. If I can answer that question in reserve. Yes, please answer the question. The phrase short-term limited duration insurance, in fact, does not appear anywhere in the Affordable Care Act. What appears in the Act is a cross-reference to the definitional provision of individual insurance, which appears in the older HIPAA statute. So Congress simply did not have SDLDI in mind at all at the time because it did not use that term. It does not appear in the text of the statute at all. And so I think that it is entirely reasonable to think that Congress simply did not have it in mind and did not mean to say anything. I'm sorry, did not have SDLDI in mind? At the time that it enacted the ACA, correct. Every major insurance reform in the ACA, the community rating, the guaranteed issue, the pre-existing condition span, they all have cross-references to the individual health insurance provision of HIPAA, which as a matter of definition excludes SDLDI. That is correct, Your Honor, but I guess I would say that if we're talking about the ratification doctrine, then the question is whether or not Congress had in mind the rule that is said to have been ratified. And the cross-referencing definitional provision that excludes SDLDI, when SDLDI was not itself mentioned in the course of the entire legislative background of the ACA, it makes it very unlikely that Congress actually had in mind SDLDI itself, let alone the regulation interpreting it that was on the books at that time. I want to make sure I understand your argument. Is the trust of your argument that the purpose of the ACA was to create a single risk pool and that SDLDI rule works across purposes with that? Is that the gravamen of your argument? That is one of our arguments, that is correct. Congress created several exceptions to the single risk pool, didn't it? This wasn't the only one. It created an exception for fixed indemnity insurance. It grandfathered plans. So I don't think it's a fair reading of the ACA to say that it was creating a single risk pool. It certainly was trying to create one very large risk pool, but we have at least two other exceptions with the fixed indemnity insurance and the grandfathered plans. What's so wrong about having a third under the reading of the SDLDI rule? It created a single risk pool for essentially all primary insurance, all insurance that people would purchase as their principal form of health insurance. And the fixed indemnity insurance that Your Honor mentioned does not fall in that category. What about the grandfathered plans that do? Those were expressly accepted from the single risk pool as a transitional phase. I mean, as Congress expressly recognized, the idea was to move everybody towards ultimately a single risk pool that there would no longer be grandfathered plans. And so Congress expressed the exception that Congress included in the ACA to the single risk pool. The problem with the rule that's been adopted here is that it creates an entire new form of primary insurance that's going to be sold in competition with the ACA compliant plans. We'll draw literally, I mean, the departments themselves acknowledge, we'll draw millions of people out of those plans. And therefore, on the face of it, frustrate the central thrust and purpose of the single risk pool in a way that these other sort of marginal and non-primary insurance plans. In fact, the rule hasn't destabilized the exchanges, has it? Well, it depends what you mean by destabilized, Your Honor. The departments themselves recognize that it will draw more than a million people out of the ACA compliant plans. It will drive up the price of those plans. How much? It's a modest increase, right? Over the next 10 years or so? The departments predict that it will be a 5% increase. The other estimates are different and larger. For people who are living on the margin, a 5% increase for an expensive product like health insurance makes a big difference. And so I think there is no question that it will draw significant numbers of people out of the ACA compliant plans, make those plans more expensive, make it more difficult for people who rely on those plans to purchase them. You say it will draw them out because people will make a choice that they would rather have this more limited form of coverage. That's correct. It will draw those people out. Because it will get us for that? I'm sorry, Your Honor. Because it will cost for them than purchasing ACA compliant insurance? Is that the argument? I think that is correct. It will draw them out because it is cheaper. Now I think our understanding is that Congress, when it enacted the ACA, it believed that all plans in the individual market should have minimum essential benefits and other protections which were designed to combat the problems that had plagued the health insurance market prior to the enactment of the ACA, which meant that many people who ended up... What do you do with the argument that the premiums won't, destabilize these exchanges because so many folks in these exchanges are having their premiums subsidized? I think that that's a misleading argument, Your Honor, because first of all, there are many people who buy their insurance, ACA compliant insurance, off of the exchange and therefore they don't get subsidies. But even for those who do get subsidies, for many of these people, they are partial subsidies and often a very, very small portion of the subsidy. And we make this point and give some of the statistics in our reply brief on this. And so these people are going to remain highly sensitive to price. And price increases, even a 5% price increase, could make quite a substantial difference to people in this category. That's fair. Excuse me. Is this Judge Cassis? Yes. Just one final question. I'm sorry? Please continue. One final question, which is, that account has some force to the extent we're focused just on the line between the category of people who have compliant insurance, whether through an exchange or otherwise, as opposed to the less generous but less expensive package that comes with STLDI. But don't you also have to focus on, like, there's another category under the Affordable Care Act, which is people who are lawfully uninsured. And that included everyone who was within the exemptions to the mandate and the exemptions to the penalty. Now that the court has told us that the mandate is really a tax, right, that there's a lawful option not to buy health insurance, and there are a lot of poor people, given the court striking the Medicaid expansion, right, there are a lot of people below the poverty level who don't qualify for Medicaid, who don't qualify for the subsidy. If you focus on the line between STLDI and lots of people who would otherwise just be uninsured, why doesn't it look like a pretty good option? Because you might be drawing some people from the exchanges, but you're going to be drawing a lot of people in who would otherwise just be lawfully uninsured. Well, I think Congress had in mind the possibility that some people would regard ACA-compliant insurance as being too expensive, and it addressed that in its own way. It did it by providing subsidies, and it did it by requiring that all the insurance policies be in a single risk pool to keep the price down. I mean, Congress was aware of this, and it chose to structure the ACA in the way that it did. Inevitably, if one takes the approach that the departments have done here, it will draw people out of the ACA-compliant plans who otherwise would have been in them. And again, the departments themselves say that more than a million people who would have been insured under the ACA now will take SDLDI insurance instead. And so it's going to draw people out of the comprehensive, high-quality insurance that Congress wanted everybody to have, and it's going to put them into something which is inadequate. And the fact is the SDLDI regime replicates all the problems in the insurance market that had existed prior to the enactment of the ACA, which are described in alarming detail in the briefs that are filed in this court, the amicus briefs by the American Medical Association and the American Cancer Society, other leading groups of physicians and patient advocacy organizations. So it's going to recreate all the problems, replicate all the problems that Congress meant to sweep aside when it enacted the ACA. So I think that's what Congress had in mind. It was aware that people might forego payment of the mandate penalty, even when it was applied, and it nevertheless said this is the structure that we want to have people in. We want to draw people into high-quality, comprehensive insurance. And that's what we want to do. So as to keep... Oh, I'm sorry. Okay. I'm fine. I'm sorry. I know that I'm well over my time, so if I can resume. Well, we think this case deserves adequate questioning, and I don't want to cut Judge Cassius off. No, it was just a follow-up, which is it just seems very odd. If you focus on the people who are below 100% of the federal poverty line, they're not eligible for Medicaid, at least in many states. They can't possibly afford compliant insurance without the subsidy, which they're not eligible for. Their choice is STLDI or nothing, and it's a little bit odd to impute to a Congress that wants people to get more insurance rather than less to force those people into the option of nothing. That is perhaps not a question. That is a statement of fact. And I think let's hear from the government, and we'll give appellant time on rebuttal. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Daniel Winnick for the government. When Congress passed the Affordable Care Act, it incorporated the existing definition of individual health insurance coverage, which explicitly in bright flashing lights excluded short-term limited-duration insurance. In doing so, Congress approved as permissible the definition of short-term limited-duration insurance that departments had applied for more than a decade. The departments left that rule, that long-standing definition, in place under the ACA until 2016. They didn't see it as foreclosed by the single-risk pool provision, and to see why, I think you only have to look at the text of that provision, which is in 42 U.S.C. Section 18032c.1. A health insurance issuer shall consider all enrollees in all health plans other than grandfathered health plans offered by such issuer in the individual market, including not through the exchange, to be members of a single-risk pool. So right there in the text of the single-risk pool requirement, Congress is explicit that the single-risk pool requirement applies only to plans offered in the individual market, which again, in bright flashing lights, Congress excluded short-term limited-duration insurance from that set of plans. So is this argument in your brief? It is in our brief, Your Honor, yes, that the single-risk pool requirement is limited to plans offered in the individual market, which do not include short-term limited-duration insurance. But this argument regarding 180.032c.1? It is, Your Honor. It is in our brief. Where would I find that? Give me a moment. I'll give you a page site. Because I did not find it in the district court's opinion.  All right. So in Altman, this court accepted a very similar ratification argument, and there's some confusion in the reply brief on Altman. I think it's worth taking just a moment to talk about where Altman is set. So in Altman, the SEC had a longstanding rule that allowed it to discipline attorneys practicing before the commission for unethical or improper conduct. Congress incorporated that rule in the text of a statute. And the question in Altman was not, as the reply brief suggests, whether the rule itself was permissible, but whether the agency's longstanding interpretation of that rule to allow discipline for violations of state rules of professional conduct was permissible. And the court said that when Congress adopted the rule in a statute, it impliedly approved as permissible the agency's longstanding construction of that rule. And it didn't, in doing so, point to any hard evidence. For example, it didn't mention in legislative history of the agency's interpretation. As Mr. Rothfeld acknowledged, the standard here is not whether there is hard evidence. That would be the standard if we were making an argument that Congress had impliedly mandated the department's longstanding construction of the short-term limited duration provision. Rather, because our argument is simply that Congress approved the longstanding construction as permissible, the question is whether there is reason to believe Congress was aware of that interpretation. And here, just as in Altman, there is ample reason to believe Congress was aware. Again, Congress chose to draw the definition of individual health insurance coverage from the existing definition of the Public Health Service Act. On its face, that definition excluded short-term limited duration insurance. The exclusion was not buried in some cross-reference or in some ancillary provision. And the scope of that exclusion had been defined by the departments for well over a decade. So, just to ask you, counsel, so I'm clear. I read your argument on page 30, where you quote the language that we're discussing, although you're quoting a different subsection and not the C1 you were talking about today at argument. I thought the issue that the appellants had raised was that, sure, Congress left the choice to persons who would otherwise either have to enroll in the ATA. Your Honor, I apologize. I'm actually not able to hear your question at tailrock. I'm not sure what you're saying here. I heard the very beginning of the question, and then I lost you about ten seconds in. I'm sorry for the difficulty with this format. Your Honor, at this point, I'm unfortunately not hearing anything. Hello, Ed? Yes, now I can hear you. I can hear you, Judge. Could you hear me before? No, I could not hear you for a few minutes, but I can hear you again now. And I can as well. All right, let me see if I can condense this. What I'm trying to understand is I understood your argument to point out, although you were quoting a different subsection of 132032 in your brief on page 30, to make the point that Congress did leave a choice to persons who would otherwise be required to get what I'll call an ACA health plan, either off the exchange or the other way. Congress left that choice, but said if you take that choice, then you will end up paying a penalty. Now, if you can cobble together an insurance program that's satisfactory to you as an individual, fine. And we've had cases where people have enrolled in the National Guard when they have health problems on the horizon, get their coverage, and then when they're not covered, they get a short-term policy. Do you see any difference between that effort where the economics that Congress was presented with was such that unless as many people as were eligible were essentially required to join the ACA or pay a penalty, that allowing a short-term policy that lasts for three years is inconsistent with that where the government acknowledged that this would draw out millions of otherwise eligible people? So a couple of points, Your Honor. First, I'm trying to understand. I understand the notion that there's always been health care insurance that's short-term, but that doesn't necessarily mean that the health care system has been satisfactory to Congress. So Congress comes along and passes what it thinks is going to provide a better system and says, of course, you have a choice, but you have to pay a penalty unless you fall within one of these limited exceptions. So a couple of points, Your Honor. First, just to look at page three of our brief, we were offering a couple of distinct responses to the argument plaintiffs are making about the single risk pool requirement. I was looking for C1, and I don't see C1. But I'm not going to fuss about that. I get their argument, but I just want to be clear that that was not what you were arguing in your brief. That's all. And C1 comes in another context. But let's move on and just deal with the question. Judge Rogers, can you hear me? This is Judge Griffin. I'm trying to speak with counsel for the government here. Yeah, can you hear me? I was dropped from the call for about five or six minutes, and I want to make sure that I'm back on it now. Yes, I can hear you. Okay. Nothing happened in those five or six minutes. Okay. Counsel didn't hear me either. It's just that I was dropped from the call, and I tried to get back in, and I was on a permanent mute, and I don't know. I'm not on the screen anymore. I'm just by the phone. It's kind of a mess. But anyway, I'm back here. Is there a question pending, or can I ask one with fear that maybe it was covered while I was gone? Your Honor, Judge Griffin, there is a question pending from Judge Rogers, which I'm happy to address. First, Judge Rogers, in five seconds only, the bottom paragraph on 30 does address 18032C1, so we are making the argument in the brief. On your broader question, it's true. Counsel, I'm looking at page 30, all right? And I'm looking at what your argument says, all right? And the point we were addressing earlier is not that argument. But I'm willing not to focus on that and deal with the merit of the point, all right, that you're making. Yes, Your Honor. So can you respond to my question about if Congress has the economics of a health care system before it, where it sets up a system that it leaves choice, but it's choice that has a penalty associated with it? Yes, Your Honor. So at the time Congress enacted the Affordable Care Act, it believed, because it had been told by the Congressional Budget Office, that millions and millions of people would not acquire comprehensive coverage. That included some 4 million people who would choose to pay the penalty rather than acquiring comprehensive individual coverage. It also included some 14 million people who were exempted from the penalty. So even at the time Congress enacted the ACA, most of the millions of people it didn't believe would acquire comprehensive coverage, the people who were exempted from the penalty for one reason or another, including because of low income. That said, the elimination of the penalty has not altered the basic economic framework for incentivizing comprehensive coverage in the individual market, which is the subsidies. It remains true today, as it did at the time of the enactment of the ACA, that the vast majority of people who purchase insurance on the exchanges qualify for a subsidy to do so. But in many cases, that subsidy covers the bulk, if not all, of the cost of a comprehensive plan. And this is an essential point in view of when... Counsel, Counsel, Counsel, I just want to get the focus on, the economics did identify a number of people who would be exempted, either because of specific provisions in the ACA, or for some of the reasons you're suggesting. As I understand, part of the argument here is that now, if the rule is allowed to stand, it's saying that Congress also contemplated setting up a system that would draw many more millions of people out of the health system that Congress thought would provide better care. I'm just trying to understand that at the time, Congress acted as distinct from what the Supreme Court said thereafter. So what Congress did in the ACA, Your Honor, was to preserve pre-existing exceptions from the requirements for individual market coverage. Those include not just the exception we're discussing today for short-term immigration plans, but also the exception for things like fixed indemnity insurance, which this court addressed in Central United. I think Central United makes an important point, which is that the exceptions in the ACA are as much a part of the ACA as the ACA's requirements. So Congress was well aware that it was maintaining these alternative coverage options, and that it was doing so in view of the fact that it didn't expect for millions and millions of people to acquire comprehensive coverage in the individual market. And since the time Congress did that, as one of the colleagues earlier noted, the Supreme Court, by interpreting the Medicaid expansion as optional, created an additional set of millions of people, low-income Americans with incomes below the poverty line, some 2.3 million people who cannot possibly afford insurance in the individual market without subsidies, and who may in many cases have no coverage options other than short-term limited duration insurance. So we think the rule is entirely consistent with Congress's design in the ACA. And I would just note that not only did the departments reasonably expect that this rule would have no destabilizing effect on the individual markets, but it has turned out to have no destabilizing effect on the individual markets in the more than a year since it has been in effect. The benchmark premium in the individual market has actually fallen in each of the last two plan years, both in 2019 and in 2020. In Texas, which is... Fairness Council, that data is not part of the record. All right, let's just deal with your other arguments, which I think have a lot of strength, have considerable strength to them, but I need to understand them. That's all right. So you're saying that the 2016 rule is entirely consistent, and that given that Congress preserved all these exceptions, the fact that there are a lot of other people drawn out of the system, there's nothing inconsistent with what Congress anticipated. Is that your basic argument? That's right, although I would note the 2018 rule and not 2016. But the key point about drawing people out, first of all, Congress didn't expect, the departments didn't expect, and Plaintiff's own projections don't anticipate millions and millions of people to be drawn out. What the projections, both the departments and others, including Plaintiffs, anticipate is that the rule may cause some reduction in the number of people who have minimum essential coverage to the individual market, but that it will increase the overall number of people who are covered by some form of insurance, and that's an essential point. The department's judgment was that it was more important for a greater number of people to have some form of coverage than to give people an all-or-nothing choice between comprehensive coverage and no coverage at all, with the cost of causing a greater number of people to have no coverage at all. It's an essential point. And on the economics of this, I think one point that's critical to understand, Mr. Rothfeld mentioned in a brief note that for some people who are at the top end of the income range for subsidy eligibility, the subsidy itself may not be very high, but that importantly does not mean that those people are any more price sensitive than anybody else who's eligible for subsidies to changes in the benchmark premium. The way the subsidy formula works, and this is in Section 36B of the tax code, is that it defines the subsidy as the excess of the benchmark premium over a specified percentage of the individual's income. So even for somebody who has today, for example, a $13 subsidy, which doesn't cover very much of the cost of the plan, if the benchmark premium increases by $100, that person's subsidy will go to $113. So critically, for anybody who's subsidy eligible, which is, again, 87% of people who buy insurance on the exchanges, those people are completely insensitive to changes in the benchmark premium. So that's why there is no risk of a death spiral from modest changes in the benchmark premium, even if the rule induces some relatively modest number of people to leave the individual markets because they're not subsidy eligible or because the subsidy covers a small amount. There's no reason to believe that increases in the premiums will cause an accelerating migration out of the individual market, which is a death spiral. And that's the only relevance of the more recent data, is that in fact there's been no such death spiral or anything close to it. The markets are healthy and stable. And I think that's relevant, even though it's outside the record, in that it validates the reasonableness of the department's expectations at the time they enacted the rule. Mr. Wink, I'm sorry, Judge Rogers. Go ahead. I'm sorry. Who is this, Judge? Yeah, Judge, go ahead. I'm sorry. Do you want to finish your question, and then I'll come back? No, you go ahead with yours, and then I'll come back. Counsel, what would your response then be to Appellant's argument that the judgment the department has made is one for Congress, and there's no indication that Congress delegated that kind of basic judgment to the department? The judgment the departments have made, Your Honor, is well within the scope of what Congress delegated. The judgment the departments have made is about the scope, is about the definition of short-term limited duration insurance, which is a category of insurance Congress defined as exempt from individual market requirements without placing any definition at all on what that phrase means. So the departments had to define that phrase. This isn't a mouse hole or an elephant. I mean, the phrase is left completely undefined by statute, and so the departments do have delegated discretion to define it. Nor is this remotely this work. Except, I just want to, it did use short-term limited. Correct, Your Honor, it did. And that's the text the departments have reasonably interpreted. But Congress was fully aware, of course, of how to say three months or six months. It did that in other provisions of the statute, as in many statutes, and it didn't do any such thing here. So I think there's no question that Congress intended the departments to define a short-term limited duration insurance. And for the reasons we explained in our brief, we think their construction was eminently reasonable. Thank you. Judge Griffith, my apologies. No, no, no, no. We're all laboring with this technology, which is new to us, but remarkably helpful given the circumstances. Thanks for your patience. Counsel, I've got a couple of questions. How is the STLBI policy short-term or limited in duration when the rule itself acknowledges that consumers can string them together, making them functionally infinite? I know the policies are technically capped to three years, but can't consumers string them together so that there really is no end to them? It's possible, Your Honor, for consumers to buy what are essentially option contracts, an option to buy another health insurance policy in three years. The rule doesn't make any change to that possibility. It was lawful under preceding law. It's lawful under this rule. In the 2016 rule, I think it's worth noting, the departments had been asked to limit the availability of option contracts like that, and they declined to do so both on the ground that a restriction would be unwarranted and on the ground that it would be difficult, if not impossible, to enforce, because there's no national registry of who is a subscriber to which insurance plan at which time. But under the 2016 rule, it was true that the Kaiser Family Foundation report notes that we said in our brief people would buy four packs of insurance coverage, a three-month plan with an option to buy successive three-month plans at six and nine months down the road. So we don't think that in any way changes the validity of the department's construction of the limitation, which does apply to a single policy. The departments have required that policies sold under this exception be both short-term and limited in duration, short-term in that they're shorter than the term of a standard insurance plan and limited in duration in that they're not renewable at the option of the insured and that they're limited to three years total in duration. That interpretation of the phrase was, I should note, embraced not just by the departments but by many, many states. In the immediate wake of HIPAA, it was endorsed by the NAIC, the Association of State Insurance Regulators, who opposed the 2016 rule and supported this rule, and they did that because this rule makes sense. It protects consumers and it advances the purposes of the ACA as it did the purposes of HIPAA. Let me ask you to respond to some questions that Mr. Rothfeld gave in response to questions I asked him. Under King v. Burwell, it looks like, at least for the purposes of the ACA, we are all put to this now, right? We're supposed to look to the purpose of the ACA. And I asked him a question, you may recall, about whether it really was the purpose of the ACA to create a single risk pool in light of exceptions for fixed indemnity insurance and grandfather plans. What is your response to that? As I recall, he said fixed indemnity insurance really isn't a primary insurance, isn't a way to cover yourself, a primary insurance policy. So it's of a different sort than the STLDI policy would be. What's your response to that? Our response on the single risk pool provision, Your Honor, is based on the text of that provision, which says a health insurance issuer shall consider all enrollees in all health plans or in grandfathered health plans offered by such issuer in the individual market, ellipsis, to be members of a single risk pool. So the provision is limited on its space to individual market plans, which again Congress explicitly excluded short-term plans from the individual market. So the provision is just irrelevant here. Congress made clear that plans of this nature are not sold as part of the single risk pool. Where then do the fixed indemnity insurance plans fall in? What category am I supposed to put them under as I'm thinking about this? Fixed indemnity insurance is a form of an accepted benefit, which is separately excluded by the statute from the requirements of the individual market. Those exclusions are in 42 U.S.C., 300GG21C, and 300GG63. So it's a different category of plans that are excluded from individual market requirements, but just like short-term limited duration insurance, it's excluded from individual market requirements. And again, as this court said in Central United, by incorporating, by carrying forward that existing exception, Congress intended to make such plans available on an ongoing basis, and that decision has to be respected. Again, the exceptions from the ACA's individual market requirements, the court said in Central United, are as much a part of the statute as the requirements themselves. So we think plaintiffs are offering essentially the same type of argument that the court rejected in Central United, which is that the availability of a type of insurance protected by Congress, maintained by Congress, should be curtailed to advance Congress's ostensible purposes. We just don't think Congress's purpose was, as plaintiffs suggest, to provide an all-or-nothing choice between comprehensive coverage and no coverage at all. Had Congress intended that, it would have, as it very easily could have, eliminated the exceptions for short-term plans and fixed indemnity insurance. Okay. Thank you. I'm happy to address any further questions the court may have. Otherwise, we would rest on the brief and ask that the judgment of the district court be affirmed. Thank you. Your Honor, this is Charles Roth. If I can speak a little bit on rebuttal? Yes, of course. Just a couple of quick points. First, on the question that Mr. Vinnick raised about whether this is an elephant in a mouse hole, we think this clearly runs afoul of Justice Scalia's admonition that Congress does not put elephants in mouse holes. What the rule does here is create an entirely new form of primary insurance that had never previously existed. Mr. Vinnick suggested that our reference to millions of people is not accurate. I have to disagree with him on that. The President's Council of Economic Advisers itself predicted that a million people would leave ACA-compliant insurance for SDLDI within the next year. Departments themselves predicted that that would happen in a somewhat longer period of time. So there's no question that the rule is going to have the effect of creating a form of primary insurance that had never previously existed. SDLDI, at the time of HIPAA's enactment and at the time of the ACA's enactment, was used exclusively as a form of transitional insurance. It was not used as primary insurance. What the rule does now is redefine it in a way which makes it operate for the first time exactly in its classical manner in the same way as comprehensive primary insurance does. It can last for as long as a year. It can be renewed for up to three times. As Judge Griffith noted, it can be kind of stacked so that it lasts forever. That is a completely novel use of SDLDI. It will restructure the insurance market in a very fundamental way that will have a profound effect on the lives of millions of people, both those who are buying SDLDI and those who are paying higher prices for their ACA-compliant insurance. I think that, as Justice Scalia pointed out, this is not the way that Congress operates. When Congress means to give agencies the authority to draw this kind of dramatic change, it does not do it by cross-reference to a definitional provision in another statute that contains an exception to an obscure form of product that had never been used for this purpose before. I think that this is simply outside the scope of the authority that Congress meant to give the departments. Second, to raise a point also that was touched upon by Judge Griffith, which I didn't really get to address in my opening remarks, which is the language of the statute that is being interpreted here, short-term limited duration. Short-term has to be given a meaning that is consistent with the ordinary usage of that language. Everybody acknowledges that short is a relative term. Short-term has to be short in comparison to the standard term. Everybody agrees the standard term of health insurance is one year. So by ordinary usage, which Congress must presume to use, a plan that lasts for 364 days and 23 hours is not short-term. Our opening brief in this court was 12,997 words. That's three words short of the limit. No reasonable person would say that our opening brief is a short brief, and that same principle applies here. Please continue. Just one more quick point in response to a question that I think was raised by Judge Cassis and the Medicaid ruling in the NFIB and whether or not that has some bearing on the interpreted question here. Congress was well aware of that ruling. There was extensive debate about what should happen to the ACA both before and after that ruling. No subject has gotten more attention in Congress over the last 10 years in what should happen to the ACA. There have been repeated proposals to change it in response to NFIB, to repeal it altogether. Congress has refused to take any of those steps, and so what the departments are doing here is stepping in to do something that Congress refused to do. They are rewriting the statute in ways that Congress initially considered and chose not to do, Congress was presented with and chose not to adopt, and that is something outside the authority of agencies. When Congress has been presented with and it's considered a question and has chosen not to act, agencies cannot step in and rewrite the law in Congress's place. So if there are no further questions. Are there any further questions, Judge Griffith or Judge Cassis? I'm fine. All right. Thank you. Counsel, we will take the case under advisement.
judges: Rogers, Griffith, Katsas